# IN THE COURT OF APPEALS OF IOWA

─────────────

No. 25-0562
Filed July 22, 2026

─────────────

**Craig Roberts and Kristin Roberts,**
Plaintiffs–Appellants,

v.

**Grinnell Select Insurance Company and Grinnell Mutual Reinsurance Company,**
Defendants–Appellees.

─────────────

Appeal from the Iowa District Court for Greene County,
The Honorable Ashley Sparks, Judge.

─────────────

**REVERSED AND REMANDED**

─────────────

Webb L. Wassmer (argued) of Wassmer Law Office, PLC, Marion, and
Dominic F. Pechota, Decorah, attorneys for appellants.

Jack W. Leverenz (argued) of Carmoney Law Firm, PLLC, Urbandale,
attorney for appellees.

─────────────

Heard at oral argument
by Greer, P.J., and Buller and Sandy, JJ.
Opinion by Sandy, J. Dissent by Greer, P.J.

**SANDY, Judge.**

This appeal turns on three words: "prejudicial to us." The carrier wrote them into its own policy. The district court read them out.

Craig and Kristin Roberts (together, the "Robertses") sued Grinnell Select Insurance Company and Grinnell Mutual Reinsurance Company (together, "Grinnell") for breach of contract and bad faith after they allege the carriers refused to pay underinsured-motorist benefits following Craig's collision with an underinsured driver. The carriers moved for summary judgment on the ground that the Robertses had breached the auto policy by failing to submit, before suit, to a physical examination, an examination under oath, and the production of certain documents. The district court agreed, presumed prejudice to the carrier, and dismissed all three claims.

We reverse and remand for further proceedings consistent with our holding that the contract language here does not permit Grinnell to rely on the presumption of prejudice discussed in cases like *Simpson v. U.S. Fidelity & Guaranty Co.*, 562 N.W.2d 627 (Iowa 1997). On remand, the district court shall consider whether the summary-judgment record proves actual prejudice absent a presumption. The court's review shall be limited to the arguments the parties made before appeal.

## BACKGROUND FACTS AND PROCEEDINGS

In November 2022, Craig was injured in a collision with an underinsured motorist, Abel Vargas, who ran a stop sign. Vargas's liability carrier tendered its $300,000 limits. The Robertses then turned to their own coverage: a Grinnell Select auto policy with underinsured-motorist coverage, and a Grinnell Mutual umbrella policy with an underinsured-motorist endorsement. The combined limits were $1.25 million.

On March 25, 2024, the Robertses sent the carriers a twenty-two-page settlement opportunity letter demanding the policy limits. The letter attached Craig's medical records and described the basis for the claim, including a $500,000 estimate for future medical expenses and a $300,000 estimate for past and future wage loss following early retirement.

On April 23, 2024, the carriers' counsel responded by email. He explained that, given the "previously unidentified injuries outlined in the demand," the carrier needed time and information to evaluate the claim. He proposed dates in May for a physical examination with a physician of the carrier's choosing, dates in June for an examination under oath, and asked for a patient's waiver, a list of Craig's medical providers, a Social Security Administration waiver, and employment records.

The Robertses' counsel responded the following day. He acknowledged the email and stated that the Robertses would be filing suit soon and would forward the petition for acceptance of service. He did not refuse any of the requests. He did not address them. No further communication has occurred. The carrier did not renew its requests. It did not warn that continued silence would be treated as a material breach. It did not state that coverage would be at risk.

On May 20, 2024, the Robertses filed their petition. The carriers answered. The parties exchanged initial disclosures, which included a patient's waiver and a list of medical providers. On July 19, 2024, the district court approved a trial scheduling order setting trial for April 14, 2026. Written discovery could be served until January 14, and depositions could be taken until February 13.

The carriers served no interrogatories. They served no requests for production. They noticed no deposition of Craig Roberts. They noticed no independent medical examination under Iowa Rule of Civil Procedure 1.515. They made no renewed request, by any means, for any of the items their April 23 email had identified.

On October 31, 2024, the carriers moved for summary judgment. The motion did not allege prejudice. It argued that prejudice was presumed. The Robertses resisted, supplying an affidavit from their counsel attesting that he was aware of no prejudice and that all of the requested items could be—and were intended to be—provided through the ordinary discovery process. The carriers' reply did not contradict the affidavit. It simply restated the presumption of prejudice.

The district court granted the motion. It read the policy as imposing conditions precedent to coverage; it found that the Robertses had not substantially complied with those conditions; it found no excuse or waiver; and it presumed prejudice. The court treated the policy's express prejudice language as "consistent with" the *Simpson* framework rather than as an allocation of burden. The Robertses' motion to reconsider was denied.

They now appeal.

## STANDARD OF REVIEW

We review the district court's summary judgment ruling for the correction of legal error. *Hagenow v. Am. Fam. Mut. Ins.*, 846 N.W.2d 373, 376 (Iowa 2014). Viewing the evidence in the light most favorable to the nonmoving party, "summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to a judgment as a matter of law." *Id.* (cleaned up).

## DISCUSSION

### I. The Auto Policy

Part E of the Grinnell Select policy is captioned "Duties After an Accident or Loss." It opens with a single sentence that controls everything that follows: "We have no duty to provide coverage under this policy if the failure to comply with the following duties is *prejudicial to us*." (Emphasis added).

The clauses that follow list the duties the carrier invokes here—cooperation with the carrier's investigation, submission to physical examinations and examinations under oath at the carrier's reasonable request, and authorization to obtain medical and pertinent records. Part F, the general-provisions section, adds: "No legal action may be brought against us until there has been full compliance with all the terms of this policy."

Two questions follow. The first is whether the prejudice condition in Part E matters. The second is whether, on this record, the carrier has met it.

### A. The Text Controls.

We give effect to every word and every provision of a contract, and we assume in the first instance that no part of the agreement is superfluous. *U.S. Bank, Nat'l Ass'n v. Bittner*, 986 N.W.2d 840, 848 (Iowa 2023). "[A]n interpretation which gives a reasonable, lawful, and effective meaning to all terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect." *Iowa Fuel & Mins., Inc. v. Iowa State Bd. of Regents*, 471 N.W.2d 859, 863 (Iowa 1991).

The carrier drafted the "prejudice to us" condition. It is the carrier's first word on the subject of its own duties. It is unambiguous.[1] Reading the clause as a restatement of background common law—"consistent with Iowa case law regarding prejudice," as the district court and dissent urge—would leave the sentence to do no work the common law was not doing already. The clause does work only if it shifts something. What it shifts is the trigger for denial of coverage. The carrier has "no duty to provide coverage" not because the insured failed to comply, but because the insured's failure to comply was "prejudicial to us." The trigger is thus prejudice—not noncompliance. By applying the *Simpson* presumption-of-prejudice framework as though the policy were silent, the dissent treats the prejudice clause as though Grinnell had never written it. That is precisely the surplusage the law of contract construction forbids. *Bittner*, 986 N.W. at 848. ("[W]e assume in the first instance that no part of an agreement is superfluous.").

Part F does not undo this allocation. Part F's "full compliance with all the terms" requires compliance with Part E as Part E reads, in its own first sentence, as a duty qualified by prejudice. The two provisions describe the same architecture from different angles. Part E identifies when the carrier's coverage duty is released. Part F identifies when the insured's right to sue matures. Both speak through the prejudice condition the carrier wrote.

---

[1] But even if ambiguous, Iowa courts apply the doctrine of *contra proferentem*, holding that when a contract contains ambiguous terms, those ambiguities are strictly construed against the drafter and in favor of the non-drafting party. *See id.* at 862; *Village Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 555 (Iowa 1981); *Fashion Fabrics of Iowa, Inc. v. Retail Invs. Corp.*, 266 N.W.2d 22, 27 (Iowa 1978); *Rector v. Alcorn*, 241 N.W.2d 196, 202 (Iowa 1976).

To be sure, the canon against surplusage is "but one rule of construction," not "the be-all and end-all." *Id.* at 850 (citation omitted). It yields where the competing interpretation is a greater reach. But this is not that case. Reading Part E to mean what it says—prejudice is the trigger—requires no strain at all. It is the carrier's own sentence, given its plain operation.

## B. *Watson, Chandler, and Simpson* do Not Displace the Contract.

The carrier relies on *Watson v. National Surety Corp.*, 468 N.W.2d 448 (Iowa 1991), *American Guarantee & Liability Insurance Co. v. Chandler Manufacturing Co.*, 467 N.W.2d 226 (Iowa 1991), and *Simpson v. U.S. Fidelity & Guaranty Co.*, 562 N.W.2d 627 (Iowa 1997). None of these decisions speaks to the policy before us.

*Watson* held that, under a fire policy whose terms made full compliance a precondition to suit, the insured's refusal to submit to an examination under oath was a material breach. 468 N.W.2d at 450–51. The policy in *Watson* contained no prejudice provision; the word "prejudice" does not appear in the opinion. *Watson* also involved four separate requests over five months and an express warning that "continued refusal to submit to examinations under oath would be treated as a material breach of the insurance contract." *Id.* at 450. The carrier here issued one request, received a response, and let the matter rest.

*Chandler* involved a liability carrier seeking to disclaim coverage under a cooperation clause after the insured failed to participate in defense of a third-party suit. 467 N.W.2d at 227. The policy contained no prejudice provision. The supreme court held, among other things, that an insurer "cannot avoid its obligation on a policy because of an insured's breach of a

7

cooperation clause unless it exercises reasonable diligence in securing the insured's cooperation." *Id.* at 230.

*Simpson* announced a default framework for policies that condition coverage on compliance and are silent as to prejudice. Under that framework, the insured bears the burden of showing substantial compliance, excuse, or waiver, and if those are absent, prejudice to the insurer is presumed. 562 N.W.2d at 631. *Simpson* did not address—because it had no occasion to address—what happens when the policy itself speaks to prejudice. It would be strange to read *Simpson* as forbidding the very allocation the carrier here adopted in its own contract.

Parties to a contract are free to allocate burdens by agreement, and where they have done so, the agreement controls. *See Davenport Bank & Trust Co. v. State Cent. Bank*, 485 N.W.2d 476, 480–81 (Iowa 1992) (holding where contract terms allocate a risk to a party, that party "assumed the risk . . . under the agreement" and is "precluded from the defense . . . as a matter of law"); *Royal Zenith Corp. v. Citizens Publications, Inc.*, 179 N.W.2d 340, 346 (Iowa 1970) ("By agreement the parties can, of course, cast the ultimate burden of loss among themselves wherever they choose [and] which one of them they intended should be the ultimate risk taker."); *Buschell v. Cont'l W. Ins. Co.*, No. 07-4168-CV-C-NKL, 2008 WL 11337947, at *2 (W.D. Mo. July 22, 2008) ("[A]n insured and an insurer are free to define and limit coverage by their agreement." (citation omitted)).

We hold that the prejudice condition in Part E means what it says. The carrier may deny coverage under Part E only on a showing that the insured's noncompliance was prejudicial to it. That burden lies on the carrier.

## II.     The Umbrella Policy

The umbrella policy provides underinsured-motorist coverage only where coverage is afforded under the "underlying insurance." The underlying insurance is the auto policy. The district court dismissed the breach claim under the umbrella policy on the sole ground that the auto policy was breached and no coverage was available beneath the umbrella. Because we have reversed the dismissal of the auto-policy claim, the umbrella-policy claim rises with it. We conditionally reverse the dismissal of this claim.

## III.    Bad Faith

The bad-faith claim was dismissed on a single ground: that the carrier had a reasonable basis to deny coverage under the auto policy because the Robertses had failed to comply with policy conditions. With that ground gone, the dismissal cannot stand on the analysis the district court gave.

We decline to reach further. The first element of a bad-faith claim—whether the carrier lacked a reasonable basis to deny—may yet be developed differently on remand once the underlying coverage question is in a different posture. *See Bellville v. Farm Bureau Mut. Ins. Co.*, 702 N.W.2d 468, 473 (Iowa 2005). The subjective element—whether the carrier knew or had reason to know that its position lacked a reasonable basis—depends on internal decision-making materials that the Robertses have not yet had the opportunity to develop in discovery. The district court did not address either element on its merits, and we will not anticipate its analysis on a record that has not been made.

We conditionally reverse the dismissal of the bad-faith claim and remand for further proceedings.

## CONCLUSION

We hold that the prejudice condition in Part E means what it says. The carrier may deny coverage under Part E only on a showing that the insured's noncompliance was prejudicial to it. That burden lies with the carrier. We accordingly reverse and remand for further proceedings consistent with our holding that the contract language here does not permit Grinnell to rely on the presumption of prejudice discussed in cases like *Simpson.* On remand, the district court shall consider whether the summary-judgment record proves actual prejudice absent the presumption.; in doing so, the court's review shall be limited to the arguments the parties made before appeal.

**REVERSED AND REMANDED.**

Buller, J., concurs; Greer, P.J., dissents.

**GREER, Judge** (dissenting).

I respectfully dissent from the majority's conclusion that the district court's dismissal of Craig and Kristin Roberts's (collectively the Robertses) petition was incorrect. I would affirm the district court order granting summary judgment in favor of Grinnell Select Insurance Company and Grinnell Mutual Reinsurance Company (collectively Grinnell), dismissing the breach-of-contract and bad-faith claims. Here is my reasoning.

The Robertses argue they substantially complied with conditions precedent in the applicable insurance policy, and even if they did not, Grinnell failed to show prejudice, and the court erred by dismissing their claims. Based upon my review, as a matter of law, I would affirm as Grinnell has shown the Robertses failed to substantially comply with the conditions precedent to coverage and that Grinnell was prejudiced by that failure, but as noted below, this case can be resolved on the prejudice prong.

The majority skipped past these two steps—substantial compliance and prejudice—and instead engaged in an analysis of common policy language and ignored the compliance findings of the district court. Even though I disagree with the majority's policy interpretation and its conclusion that policy language removes the presumption of prejudice factor from the district court's consideration, and irrespective of who had the burden to show prejudice or if a presumption applied, I would find that prejudice was shown, and the majority's concern over the policy language is irrelevant.

On these undisputed facts, prejudice was proven and it is unnecessary to remand to the district court to review the summary judgment record for proof of prejudice. So, I start with my analysis of how prejudice was shown.

11

## I. Prejudice.

The majority states that "[t]he carrier may deny coverage under Part E only on a showing that the insured's noncompliance was prejudicial to it." That showing was made. The Robertses made two claims: (1) breach of contract and (2) bad faith. Bad faith is a serious allegation, and punitive damages can be awarded if it is shown that (1) Grinnell "had no reasonable basis for denying" their claim and (2) Grinnell "knew or had reason to know that its denial . . . was without reasonable basis." *Bellville v. Farm Bureau Mut. Ins.*, 702 N.W.2d 468, 473 (Iowa 2005). With that in mind, the Robertses' actions in inhibiting the resolution of the claim pre-suit can have serious consequences for the carrier's ability to evaluate the claim so that it may avoid allegations of bad faith. In essence, under the undisputed facts here, negative consequences fell to Grinnell based on the filing of the petition.

To explain, it is uncontested that on March 25, 2024, the Robertses sent a "settlement opportunity letter" to Grinnell requesting $1.25 million in damages, which represented the combined policy limits. The letter was named a settlement opportunity letter for a reason, which became apparent in the final paragraphs. Toward the end of the settlement opportunity letter, the Robertses' counsel stated that "this is the *only opportunity* that will exist for Grinnell Mutual to settle this case *within the policy limits*" with the offer expiring in thirty days. (Emphasis added). Counsel confirmed that the letter represented a "*time-sensitive unequivocal settlement opportunity*" to settle within the policy limits and, if Grinnell did not tender the combined policy limits within thirty days, "*that* [*counsel*] *intend*[*ed*] *to ask a jury to award Craig somewhere around $10 million . . . for Grinnell Mutual's bad-faith refusal to tender*" the policy limits. (Emphasis added).

12

So, Grinnell's counsel requested the Robertses perform the conditions precedent to coverage, which included information that would allow Grinnell to make an independent decision about the value of the claim within the thirty-day window. Certainly, the insurer is not required to rely upon a plaintiff's counsel's evaluation of the value of a claim. That is why conditions precedent to coverage involve gathering information critical to understanding the claim made. *See Watson v. Nat'l Sur. Corp.*, 468 N.W.2d 448, 452 (Iowa 1991) (noting that to determine whether to pay or deny an insured's claim, the insurer needs the evidence at the time of the investigation).

What followed is also undisputed. The Robertses did not comply with any of the pre-suit requests made by Grinnell and instead filed suit on May 20. By ignoring the policy requirement that they were to comply with the conditions precedent before filing suit, at this juncture, the Robertses pled their way to prejudice.

Their decision not to comply with the pre-suit requests and to instead file suit prejudiced Grinnell in two practical respects. One, it is undisputed in this record that Grinnell Mutual will not be able to settle within the limits of the coverage—that window passed as confirmed by the settlement opportunity letter that it was Grinnell's "final opportunity . . . to settle this case for within the combined policy limits." Two, Grinnell Mutual lost its contractual right to investigate the claim pre-suit, which goes directly to its ability to avoid a bad-faith claim. In other words, considering the undisputed facts, Grinnell Mutual was prejudiced by the actions of its insureds based on the position in which it was placed when the Robertses refused to comply with the pre-suit investigation.

Now, the majority would have Grinnell Mutual face a bad-faith lawsuit, which is part of the remaining claims, alleging a bad-faith failure to pay the full policy limits with the claimed intention of Robertses' counsel to now pursue a multi-million-dollar verdict. And whether that valuation is realistic or not, the risk of exposure to liability is real along with the added cost of litigation expenses all because of the insureds' breach of the insurance contract and lack of cooperation with the conditions precedent to coverage. As Grinnell's argued in its resistance to the motion to reconsider, amend, or enlarge: "[D]espite [the Robertses] being the ones who prevented [Grinnell] from completing an investigation, it was [the Robertses] who still sued [Grinnell] in bad faith for failure to pay the claim, a claim in which [Grinnell was] prevented from investigating by their own insured, [the Robertses]."

In sum, under the undisputed facts that were made part of the summary judgment record, Grinnell was prejudiced by the Robertses' noncompliance with the policy's conditions precedent. Grinnell was denied the pre-suit determination of whether it had a reasonable basis to not settle but instead to allow the deadline found in the settlement opportunity letter to expire. *See Galbraith v. Allied Mut. Ins.*, 698 N.W.2d 325, 328 (Iowa 2005) (setting out the elements of a bad-faith cause of action). And even more, given the terms of that settlement opportunity letter, Grinnell was thereafter prejudiced as its "only opportunity" to settle for policy limits came pre-suit and before investigation. The Robertses' stance ignores the fact that Grinnell would now be required to expend time and resources defending a lawsuit, including the bad-faith claim. *See W. Mut. Ins. v. Baldwin*, 137 N.W.2d 918, 927 (Iowa 1965) ("In the case at bar prejudice is presumed. It also appears affirmatively that there was a waste of time, effort and expense."). And Grinnell was without the ability to rely upon its own investigation to reject or accept the time-restricted settlement opportunity before the bad-faith claim

was made.  *See Reuter v. State Farm Mut. Auto. Ins.*, 469 N.W.2d 250, 255 (Iowa 1991) (affirming directed verdict in favor of an insurer on an insured's bad-faith claim where the insurer reasonably sought an independent professional evaluation of the claim and relied on the professional's opinions).

Regardless of whose burden it was to show prejudice or a lack thereof, on the record developed at the summary judgment stage, I would find that the undisputed facts, viewed in the light most favorable to the Robertses, establish that as a matter of law, Grinnell was prejudiced by the Robertses' failure to comply with the conditions precedent to coverage.  For that reason, I would affirm the district court's summary judgment ruling.

## II.  The Policy Language and the Case Law.

While I do not think we need travel this path, for the most part, the majority correctly identifies basic insurance law that has developed when an insured fails to meet the conditions precedent to coverage.  *See Simpson v. U.S. Fid. & Guar. Co.*, 562 N.W.2d 627, 631–32 (Iowa 1997); *Watson*, 468 N.W.2d at 450–52; *Am. Guar. & Liab. Ins. v. Chandler Mfg. Co.*, 467 N.W.2d 226, 228–30 (Iowa 1991).  Contrary to the majority opinion, though, I cannot conclude whether these cases involve the "prejudicial to us" policy language we find here.  While these cases quote portions of the applicable insurance policies, they make crucial omissions that limit our ability to determine whether the policies contained the same or similar language as the Robertses' policy. *See Simpson*, 562 N.W.2d at 631 (omitting various portions of "Duties In The Event Of Accident, Claim, Suit Or Loss" section of policy); *Watson*, 468 N.W.2d at 449 n.1 (omitting portions of policy regarding conditions precedent); *Am. Guar. & Liab. Ins.*, 467 N.W.2d at 227 (omitting end of the policy's sentence regarding compliance with terms).  We cannot say for

certain whether the policies at issue in prior cases contained the "prejudicial to us" language the majority relies on to reach its conclusion, so these cases do not support the majority's position.

The Grinnell Mutual auto policy included various terms and conditions, including Part E—Duties After an Accident or Loss, which provided, in relevant part,

> We have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us:
>
> . . . .
>
> B.  A person seeking any coverage must:
>
> 1.  Cooperate with us in the investigation, settlement or defense of any claim or suit;
>
> . . . .
>
> 3.  Submit, as often as we reasonably require:
>
> a.  To physical exams by physicians we select.  We will pay for these exams.
>
> b.  To examination under oath and subscribe the same.
>
> 4.  Authorize us to obtain:
>
> a.  Medical reports; and
>
> b.  Other pertinent records.

Under Part F—General Provisions, the policy warned, "No legal action may be brought against us until there has been *full compliance with all the terms of this policy*."  (Emphasis added).

Additionally, reading the policy from the majority's suggested framework rather than assuming the policy language comports with established Iowa case law—as the district court found—would conflict with

the insureds' obligation to cooperate. *See Am. Guar. & Liab. Ins.*, 467 N.W.2d at 229 ("The purpose of a cooperation clause is to protect insurers and prevent collusion."). Iowa courts have found that when an insured's ability to bring "an action was conditioned on an insured's compliance with certain policy terms, such as giving notice of the loss or cooperating with the insurer, . . . these conditions are conditions precedent to an insured's recovery under the policy." *Watson*, 468 N.W.2d at 450–51. Under the majority's interpretation, an insured could simply suggest, as the Robertses did here, that compliance with the investigation could be done later after suit, thus increasing costs of litigation to the insurer and delaying the insurer's knowledge of the claim details. Sure, the insured risks coverage, but the majority contends that it is the *insurer's burden* to prove that prejudice occurred. Under the majority view, this would be the case even, for example, when a pre-suit examination under oath would provide information that allows for a complete denial of coverage.

Because the policy provisions were conditions precedent, the Robertses must show they substantially complied with the provisions. "If an insured cannot prove substantial compliance, he or she must show that (1) failure to comply was excused, (2) the requirements of the condition were waived, or (3) failure to comply was not prejudicial to the insurer." *Simpson*, 562 N.W.2d at 631. Based on that, our case law instructs that if the insured fails to prove substantial compliance, excuse, or waiver, we are to presume the insurer has been prejudiced. For both the insured and the insurer, cooperation pre-suit is important. That is why I read the Grinnell Mutual policy as one that confirms the common law duties of an insured as developed by the case law. And, the policy language found here does not reference any change in these requirements or the burden.

In my view, it is undisputed that the requests that Grinnell's counsel made to the Robertses were indeed conditions precedent to coverage. The policy says "a person seeking coverage *must*" and then lists the duty to cooperate in the investigation and to submit to physical examinations or an examination under oath. It is also undisputed that the Robertses did not substantially comply with Grinnell's requests for the physical exam, examination under oath, executed patient's authorization, executed Social Security authorization, or employment records before filing suit. I would conclude that as a matter of law, the Robertses did not prove substantial compliance with the conditions precedent in the policy. Plus, it is also undisputed, that without qualification of any term, the policy required that legal action not be filed until there was full compliance with all policy terms.

And, I do not think any of the insurer's conduct post-filing or whether there was notice given that the coverage was at risk is relevant to this case. As a reading of the policy terms confirm, the insurer does not have to show it provided notice of any policy conditions that impacted coverage or that it had to provide any number of warnings because there are no such provisions in the auto policy. And Part F clearly states that "no legal action" could be taken against it until there was "full compliance" with the policy terms. Nothing is unclear about that requirement. Contrary to the majority's position, I would apply the long-standing Iowa case law to the issues presented here related to the Grinnell Mutual policy.

Lastly, I would affirm all other rulings in the motion for summary judgment ruling, which found that once access to the auto policy failed, the right to recovery under the personal umbrella policy coverage also was not available, and there was no legal basis for a bad-faith claim.